[Crim. No. 10386.   Second Dist., Div. Two.   Aug. 24, 1965.]

THE PEOPLE, Plaintiff and Respondent, v. SVEND
KJAR, JR., Defendant and Appellant.

Samuel Z. Winnikoff, under appointment by the District Court of Appeal, and Harry Kightlinger for Defendant and Appellant.

Thomas C. Lynch, Attorney General, William E. James, Assistant Attorney General, and Rose-Marie Gruenwald, Deputy Attorney General, for Plaintiff and Respondent.

HERNDON, J.—Defendant appeals from the judgment entered against him following a jury verdict finding him guilty of voluntary manslaughter in violation of section 192, subdivision 1 of the Penal Code, a lesser offense necessarily included within the crime of murder with which he was charged.

By way of assignment of error defendant argues (1) that the murder weapon and the testimony relating thereto should not have been received in evidence by reason of their being the fruits of an illegal arrest followed by an illegal search and seizure; (2) the receipt of appellant's confession obtained in violation of the rule established in *People* v. *Dorado,* 62 Cal.2d 338 [42 Cal.Rptr. 169, 398 P.2d 361]; (3) the refusal of the trial court to instruct on the theory of self-defense; and (4) alleged error in admitting a portion of the tape recording of appellant's confession that referred to matters irrelevant to the case.

Defendant's contentions regarding the illegality of his arrest and the discovery of the murder weapon are wholly without merit.

Appellant and a companion were arrested at approximately 11 p.m. on March 27, 1964, by California Highway Patrol officers. Officer Barnes testified that he and his partner had received a call from their office advising them that persons stopping at the Agricultural Check Station outside of Barstow, California, had complained that two men were throwing rocks at vehicles passing on the highway. The officers were informed as to the locale of the incidents and of the fact that a vehicle described as a 1949 to 1954 blue Ford or Mercury had been observed near the scene of action.

The officers promptly proceeded to the designated place and there observed a 1951 blue Mercury parked on the north

shoulder of the roadway facing in the wrong direction. Seeing no one in the vehicle, the officers parked their car across the highway and approached it from the rear. Officer Barnes' partner cast the light of his flashlight through the rear window and thereupon was able to identify both the car and its two occupants, who were lying on the seats. He recognized the occupants as juveniles to whom he had issued a citation earlier in the day for possession of alcohol.[1] The officers were also able to observe a steel bar approximately 12 inches long on the seat beside the boy in the rear of the car. This bar was tapered on one end and wrapped with friction tape on the other.

The officers quite properly decided that these juveniles should be taken into custody in accordance with the broad provisions of sections 600, subdivision (a) and 625, subdivision (a) of the Welfare and Institutions Code.[2]

Having due and proper regard for their own safety, the officers approached the car from opposite sides. They opened both doors and asked the boys to step out. When they did so they were taken to the rear of the car and searched for weapons. They denied that there were any other weapons in the car.

However, when Officer Barnes returned to the front door, which was still open, and threw the beam of his flashlight into the front seat area where defendant had been lying, he was able to observe an automatic pistol lying on the floor just

---

[1] Although defendant was a juvenile, the present action was prosecuted against him in the superior court by reason of a prior order made by the juvenile court after hearing determining that he was not a fit and proper subject to be dealt with under juvenile court law and directing that criminal proceedings be instituted against him. (Welf. & Inst. Code, §§ 603, 606 and 707.)

[2] Section 600, subdivision (a) of the Welfare and Institutions Code reads as follows:

''Any person under the age of 21 years who comes within any of the following descriptions is within the jurisdiction of the juvenile court which may adjudge such person to be a dependent child of the court:

'' (a) Who is in need of proper and effective parental care or control and has no parent or guardian, or has no parent or guardian willing to exercise or capable of exercising such care or control, or has no parent or guardian actually exercising such care or control.''

Section 625, subdivision (a) of the Welfare and Institutions Code, reads as follows:

''A peace officer may, without a warrant, take into temporary custody a minor:

'' (a) Who is under the age of 18 years when such officer has reasonable cause for believing that such minor is a person described in Sections 600, 601, or 602.''

back of the profile of the seat. This gun was later established to be the murder weapon.

We deem it beyond question that this action of the police was legal and proper in every particular. While it is doubtful that merely looking into the interior of the car would have been an "unreasonable search" in any event, (cf. *People* v. *Terry*, 61 Cal.2d 137, 152 [37 Cal.Rptr. 605, 390 P.2d 381]), in the instant case any search of the immediately accessible interior of the car for dangerous weapons was properly incidental to the arrest of its occupants. (Cf. *People* v. *Schader*, 62 Cal.2d 716, 722-725 [44 Cal.Rptr. 193, 401 P.2d 665] ; *People* v. *Burke*, 61 Cal.2d 575, 580 [39 Cal.Rptr. 531, 394 P.2d 67] ; *People* v. *Lopez*, 60 Cal.2d 223, 241 [32 Cal. Rptr. 424, 384 P.2d 16].)

█ Defendant's contentions regarding the court's refusal to instruct on the issue of self-defense is equally unmeritorious. We are, of course, fully cognizant of the duty of a trial court to instruct on a defense theory that finds any support in the evidence. (*People* v. *Young*, 214 Cal.App.2d 641, 645-646 [29 Cal.Rptr. 595].) But, as indicated, some supportive evidence must be found in the record and certainly none sufficient to raise the issue is present here.

Defendant's challenge to the asserted irrelevancy of a portion of his confession as presented need not be considered because the record is clear that the tape was played outside the presence of the jury before being presented to it and any offensive portions deleted. No objection on this point was made during the trial and the confession, as thus restricted and introduced, apparently was deemed acceptable in form by the court and both counsel.

█ Defendant's contention regarding the inadmissibility of the confession as such, however, is meritorious and requires reversal. The record clearly discloses that the investigating officers assigned to the case by the Los Angeles Police Department strongly believed him to be guilty from the inception of their investigation although they had not arrested him following their initial interviews with him in which he gave a false alibi that had been supported by a female companion. When he had been found in possession of the murder weapon at the time of his arrest by the highway patrol some 10 days after the killing, the investigating officers clearly regarded him as the primary suspect and accordingly conducted an interrogation of him designed to elicit a confession. (Cf. *People* v. *Dorado, supra,* 62 Cal.2d 338, 347 ; *People*

v. *Stewart*, 62 Cal.2d 571, 577, et seq. [43 Cal.Rptr. 201, 400 P.2d 97].) This is clearly demonstrated by the following excerpts from the interrogation which immediately preceded defendant's confession:

"Q. All right, regardless, you said you had the gun. Remember when I talked to you that morning when we brought you in? A. Yeah. Q. I said, 'I don't believe your story,' at the time. You recall it? A. Yeah. Q. All right. Now we have your gun picked up in the car. A. It's not my gun. Q. Well, I don't care whose gun it is, it's in your car, you're the one who had the beef with him that night, and he's dead. I told you that night that everything pointed to you. It looks like you're wearing the shoes. All right, now the gun's in there and the gun has been positively identified. That's the murder weapon, and it's in your possession. You're not going to wiggle out of it and you're not going to lie your way out of it, Svend. The thing to do now is to lay the complete story out. Let's have the straight story. A. I don't remember.

"Q. Well, you'd better start remembering, because I'll tell you one thing. You're not going to ride a murder beef by just not remembering, I'll tell you that for sure, because all we've got right now can send you up from now on, I'll tell you for sure. We don't have to get any story from you. If you think to make a case that we have to talk to you and get a story, we don't. A. Well— Q. You are dead-bang on it right now.

"By Sgt. Savage: Well, here's the thing, look. You've involved so many people. I talked to your mom on the phone late last night. She's crying. She's so upset that—well, it's terrible. It really is. I don't know how you feel about your folks or anything else, but I feel this way about it, the fact that you have involved all of these other people and we are going to have to have your side of the story. This is Easter Sunday—— A. I didn't involve them. By Sgt. Wahlke: Well—— By Sgt. Savage: Your folks are involved. By Sgt. Wahlke: Q. Kathy certainly didn't have any beef with him, and do you think it's right to make her ride the beef then? A. Well, all right, I did it."

Since the record fails to reveal that defendant had been advised as to his constitutional rights prior to his making his statements, the *Dorado* rule must be applied. ■ While it might be argued that his statements, considered as a whole, did not constitute a full confession of the crime of murder, they clearly constituted a complete confession to the included

offense of voluntary manslaughter on which the jury was instructed and of which defendant was convicted. The following excerpts may serve as examples:

"Q. Well, why did you do it, Svend? I mean, what was your reason for doing it? A. I wasn't at first. Q. Well, what was you going over there for? A. To call him out, you know, to tell him 'leave me alone'. Q. Yeah. Well, what was your intentions? I mean, just to talk to him? A. I was mad at him. Q. Because of what he did to the car? A. Yeah. Q. Well, how about— A. I don't know what ran through my mind at the time. I didn't want to do anything to him. . . . John [the decedent] never did anything to me. I don't know why I did it. I was there and I, you know, I seen him and I pulled the trigger, and he yelled when he was down. I didn't know what to do; I shot him again."

"Q. After you shot him the first time and he went down, how long was it before you shot him the second time? A. Well, it was a matter of seconds. Q. Where did you shoot him the second time? A. Well, I don't know. Q. What part of his body? A. In the back or some place, I don't know. He was down and I just pulled the trigger. Q. How far away were you? A. Oh, about three, four foot. About the same distance. Q. Did you aim at the upper part of his body or the lower part? A. It was right in here some place. Q. Toward his head area? Shoulder area? A. Shoulder. Right in here. Q. What was your reason for shooting the second time. A. He was yelling. He was, you know, screaming. Q. Well, were you intending to kill him then on the second shot to put him out of his misery? A. I don't know why I did it. I just—I don't know why. He started yelling and I didn't know what to do."

The judgment is reversed.

Roth, P. J., and Fleming, J., concurred.

A petition for a rehearing was denied pursuant to rule 27(e), California Rules of Court. Respondent's petition for a hearing by the Supreme Court was denied October 20, 1965. McComb, J., and Mosk, J., were of the opinion that the petition should be granted.